ROGUE GEM AND GEOLOGY CLUB, INC.,
*Plaintiff,*

*v.*

JOSEPHINE COUNTY ASSESSOR,
*Defendant.*

(TC-MD 020949F)

Trial was held November 20, 2002, in the Josephine County Courthouse, Grants Pass, Oregon.

Sue Brown, past-president of Plaintiff, Rogue Gem and Geology Club, Inc., argued the cause for Plaintiff.

Michael Schneyder, Assessor, Josephine County Assessor's Office, argued the cause for Defendant.

Decision for Defendant rendered June 10, 2003.

**SALLY L. KIMSEY, Magistrate.**

Plaintiff appeals Defendant's denial of Plaintiff's application for property tax exemption for the 2001-02 tax year. The property is listed as Account R311733 by the Josephine County Assessor. A trial in the above-entitled matter was held in Grants Pass on November 20, 2002. Sue Brown, past-president of Plaintiff, appeared for Plaintiff. Michael Schneyder, Assessor, appeared for Defendant Department of Revenue (the department). At issue is whether Plaintiff's property qualified for an exemption from property taxes under ORS 307.130.

## I. STATEMENT OF FACTS

Plaintiff incorporated as Rogue Gem and Geology Club in 1973. It amended its Articles of Incorporation in 1986 to change its name to Rogue Gem and Geology Club, Inc. The purposes of Plaintiff, as stated in its Articles of Incorporation, are:

"(1) To promote the mutual study and enjoyment of the various earth sciences, through the collecting of minerals, fossils, artifacts and gem materials, and through the practice of the lapidary arts upon such materials;

"(2) To aid in the improvement of its members in the art of cutting and polishing gem materials;

"(3) To help in the study of mineralogy and geology;

"(4) To aid in collecting of minerals and gem materials and promote interest in same;

"(5) To provide opportunity for the exchange and exhibition of specimens and materials; and

"(6) To participate in at least one good rock show a year."

When Plaintiff incorporated in 1973, Article VI of the Articles stated that "[t]his Corporation shall be non-profit in its operation and is organized exclusively for cultural, educational and scientific purposes." In 1994, Plaintiff's Board of Directors amended Article VI to state that "[t]his corporation shall be **Mutual Benefit** in its operation and is organized exclusively for cultural, educational and scientific purposes." (Emphasis added.)

Approximately 70 individuals are members of Plaintiff. Plaintiff's monthly meetings are open to its members and guests. The average attendance at the meetings is approximately 47, with an average of 42.5 members and 4.5 guests. For example, 45 members and 5 guests attended the April 2001 meeting. The meetings are typically held at a local grange. At the meetings upcoming events are planned, items of interest to the membership are discussed, elections are held, and educational presentations are made. Plaintiff occasionally holds a potluck after a meeting. For example, there is a June potluck, a potluck and white elephant sale in

September, and a Christmas potluck with bingo in December. Plaintiff often supplies the meat at those potlucks and pays for the bingo prizes for the Christmas potluck. The Christmas potluck is for members only.

Plaintiff organizes two significant events each year. Each spring Plaintiff holds a three-day show. The members rent a building for the event at a cost of $2,000. There are approximately 50 display cases, showcasing specimens from around the world. Also included is a black light display that highlights flourescent minerals in specimens along with hands-on displays such as soapstone carving. Members provide demonstrations, a silent auction, educational games, and many handouts. Exhibitors do not sell during the show. On the first day of the show, a Friday, admission is free. Friday is intended for schoolchildren; they pay half price for the games that day. Vendors rent space at the show; the fees help pay for the cost of producing the show. As stated in Plaintiff's April 2001 newsletter, "[t]his show is one of [Plaintiff's] main fundraisers. It supports the club and buy[s] us new saw blades, cab[b]ing machines, and the upkeep on the property and buildings."

The second big event Plaintiff's members produce is a booth at the Josephine County Fair. The fair requires volunteers onsite from 9:00 a.m. until 11:00 p.m. for the five-day duration of the fair, in addition to volunteers to set up and take down the materials. Plaintiff has display cases and demonstrations at its booth. Plaintiff's members also use the fair as an opportunity to raise funds for the organization. The fundraising includes a silent auction, a raffle, games, and sales of thunder eggs, grab bags, jewelry, other related items, and food items. The fair held in 2002 generated $3,970.64 in sales for Plaintiff, which was slightly less than the prior year.

In addition to the two big events, Plaintiff's members prepared a display for the Oregon state capitol and are working to create a display for the Kerbyville Museum. A few of Plaintiff's members make presentations in schools. Plaintiff publishes a monthly newsletter. It includes meeting minutes, calls for volunteers for upcoming projects, some educational material, announcements (including birthdays and anniversaries), advertisements, and other items of interest.

At some point, Plaintiff's members raised sufficient money to purchase the subject property for use as its clubhouse. Prior to its existence as a clubhouse, it was a small, single-family residence located in a modest neighborhood in Grants Pass. Since purchasing the property, Plaintiff's members have added a driveway and a garage. Plaintiff's members use the property in a variety of ways. Monthly board meetings are held there. Occasional classes are offered at the property, as well as a few tours for interested groups. Materials for the annual rock show and county fair are prepared and stored there. Plaintiff also sets aside some time for members to use the property for their personal projects. Plaintiff charges a modest fee for such use.

## II.  ANALYSIS

Plaintiff applied for the exemption under ORS 307.130.[1] The relevant portion of that statute states:

"(1)  Upon compliance with ORS 307.162 [filing requirements], the following property owned or being purchased by art museums, volunteer fire departments, or incorporated literary, benevolent, charitable and scientific institutions shall be exempt from taxation:

"(a)  Except as provided in ORS 748.414, only such real or personal property, or proportion thereof, as is actually and exclusively occupied or used in the literary, benevolent, charitable or scientific work carried on by such institutions.

"* * * * *

"(3)  An institution shall not be deprived of an exemption under this section because its purpose or the use of its property is not limited to relieving pain, alleviating disease or removing constraints.

"(4)  As used in this section:

"* * * * *

"(c)  'Nonprofit corporation' means a corporation that:

"(A)  Is organized not for profit, pursuant to ORS chapter 65 or any predecessor of ORS chapter 65; or

---

[1] All references to the Oregon Revised Statutes (ORS) are to 1999.

"(B)   Is organized and operated as described under section 501(c) of the Internal Revenue Code."

Plaintiff claims that its property should be exempt from taxation because it is a nonprofit organization that engages in benevolent, charitable, and/or scientific work.

■      In order to determine whether Plaintiff's property is exempt from property taxation, the court must undertake a two-part test. First, Plaintiff must be a benevolent, charitable, or scientific institution within the meaning of ORS 307.130. Second, Plaintiff's property must be used to further the charitable purpose of the benevolent, charitable, or scientific institution.

A.   *Benevolent, Charitable, or Scientific Institution*

■■      The Oregon Supreme Court has held that, for purposes of ORS 307.130, the words "benevolent" and "charitable" are synonymous when used in connection with one another. *Methodist Homes, Inc. v. Tax Com.*, 226 Or 298, 308-09, 360 P2d 293 (1961) (citing *Behnke-Walker v. Multnomah County*, 173 Or 510, 519, 146 P2d 614 (1944)). There are, however, some significant differences between charitable and scientific institutions. "Although a scientific organization must be in the nature of a public charity, it is distinguishable from a charitable organization. A charitable organization must have charity as its primary, if not its sole, object. A literary or scientific organization has a different primary purpose." *Math Learning Center v. Dept. of Rev.*, 14 OTR 62, 65 (1996) (citing *Dove Lewis Mem. Emer. Vet. Clinic v. Dept. of Rev.*, 301 Or 423, 427, 723 P2d 320 (1986) (internal citations omitted)). Notwithstanding the primary purpose of literary or scientific organizations, those types of organizations "must be charitable in nature." *Theatre West of Lincoln City, Ltd. v. Dept. of Rev.*, 12 OTR 479, 482 (1993), *rev'd on other grounds*, 319 Or 114, 873 P2d 1083 (1994). That means that a literary or scientific organization "cannot qualify for the exemption unless a significant portion of its activities have a charitable objective." *Theatre West of Lincoln City, Ltd. v. Dept. of Rev.*, 319 Or 114, 117, 873 P2d 1083 (1994).

## B.  *Mutual Benefit Corporation*

As noted earlier, Plaintiff's members amended Plaintiff's Articles of Incorporation in 1994 to become a mutual benefit corporation. Regardless of whether Plaintiff claims it is a scientific or charitable organization, at a minimum it must be charitable in nature. The question then becomes whether a mutual benefit corporation may ever be charitable in nature. For reasons that follow, the court holds that a mutual benefit corporation is not charitable in nature, therefore its property does not qualify for exemption.

## C.  *History of Nonprofit Corporation Act*

■   In 1989, the Oregon Legislature passed House Bill 2278, the Revised Oregon Nonprofit Corporation Act (the Act). Or Laws 1989, ch 1010. The Act was based on, and nearly identical to, the Revised Model Nonprofit Corporation Act (Revised Model Act) developed by the Subcommittee on the Model Nonprofit Corporation Act of the American Bar Association. Testimony, Senate Committee on Judiciary, HB 2278, May 8, 1989, Ex J (Art on History of Act); Testimony, House Committee on Judiciary, HB 2278, Feb 1, 1989, Ex N at 13 (Commentary on Revised Oregon Nonprofit Corporation Act). The Revised Model Act, in turn, was based on the California Nonprofit Corporation Act and the Revised Model Business Corporation Act, although "the Revised [Model] Act as a whole more nearly resembles the California Nonprofit Corporation Act than the Revised Model Business Corporation Act." Lizabeth A. Moody, *The Who, What, and How of the Revised Model Nonprofit Corporation Act*, 16 N Ky L Rev 251, 265 (1989). The Act was proposed in Oregon for three main reasons: (1) to make nonprofit corporation law easier for non-attorneys to use; (2) to have consistency, as far as possible, between nonprofit corporation law and the Business Corporation Act passed by the 1987 legislature; and (3) to clarify ambiguous areas of nonprofit corporation law. Testimony, Senate Committee on Judiciary, HB 2278, May 8, 1989, Ex J (Art on History of Act); *see also* Tape recording, House Committee on Judiciary, Civil Administration Subcommittee, HB 2278, Jan 18, 1989, Tape 5, Side B (statement of Ted Falk for Oregon State Bar); Tape Recording, House Committee on

Judiciary, HB 2278, March 3, 1989, Tape 14, Side A (statement of Rep Kelly Clark).

D.  *Types of Nonprofit Corporations*

■■    As set forth in the Act, there are three types of nonprofit corporations: public benefit corporations, mutual benefit corporations, and religious corporations. When incorporating, the incorporating entity must state in its Articles of Incorporation whether it is a public benefit, religious, or mutual benefit corporation. ORS 65.047(1)(b). A public benefit corporation is one that is "organized for a public or charitable purpose"; can only distribute its assets upon dissolution to another public benefit corporation, a religious corporation, the United States, a state, or a person who is exempt pursuant to IRC section 501(c)(3); and does not fall within the definition of "religious corporation." ORS 65.001(31). A religious corporation is one that is "organized primarily or exclusively for religious purposes." ORS 65.001(33). Finally, a mutual benefit corporation is one that "does not come within the definition of public benefit or religious corporation." ORS 65.001(24).

■     Within guidelines, the decision as to the type of nonprofit corporation is generally left to the nonprofit corporation to determine. The incorporating entity chooses the type it believes is most appropriate for its activities. Testimony, House Committee on Judiciary, HB 2278, Feb 1, 1989, Ex N at 15 (Commentary on Revised Oregon Nonprofit Corporation Act). Once it chooses, the nonprofit corporation is bound "by the rules applicable to that category." *Id.* For example, "[i]t would be impossible for a public benefit or religious corporation to follow the Revised Act's rules for mutual benefit corporations and obtain [IRC §] 501(c)(3) tax exempt status. That is because the rules applicable to mutual benefit corporations are inconsistent with the requirements of section 501(c)(3)." *Id.* at 15-16.

E.  *Characteristics of a Mutual Benefit Corporation*

■     ORS 65.001(24) defines a mutual benefit corporation by what it is not, that is, either a public benefit corporation or a religious corporation. The statute does not list positive

attributes of a mutual benefit corporation. When interpreting a statute, a court shall pursue "the intention of the legislature * * * if possible." ORS 174.020. *See also PGE v. Bureau of Labor and Industries*, 317 Or 606, 610, 859 P2d 1143 (1993) ("In interpreting a statute, the court's task is to discern the intent of the legislature."). The court first looks at "the text and context of the statute." *PGE*, 317 Or at 610. "[W]ords of common usage typically should be given their plain, natural, and ordinary meaning." *Id.* at 611 (citations omitted). If, after trying to determine the intent of the legislature from the text and context of the statute, the meaning is still unclear, the court may turn to the statute's legislative history. *Id.* at 611-12.

ORS 65.001(24) defines a mutual benefit corporation as one that "does not come within the definition of public benefit or religious corporation." It is helpful to take a closer look at those definitions. A mutual benefit corporation is not one that is "organized primarily or exclusively for religious purposes." *See* ORS 65.001(33). Nor is it one that is "organized for a public or charitable purpose." *See* ORS 65.001(31). Indeed, the word "mutual" is defined as: "1. Generally, directed by each toward the other or others; reciprocal. 2. (Of a condition, credit covenant, promise, etc.) reciprocally given, received, or exchanged. 3. (Of a right, etc.) belonging to two parties; common." *Black's Law Dictionary* 1039 (7th ed 1999). The relevant definitions of "public" include "[r]elating or belonging to an entire community, state, or nation" and "[o]pen or available for all to use, share, or enjoy." *Id.* at 1242. It is clear from comparing the two definitions and looking at the plain, natural, and ordinary meanings of "mutual" and "public" that a mutual benefit corporation is intended to benefit a select group while a public benefit corporation is intended to benefit the community as a whole. Thus, a mutual benefit corporation is not, by its very choice of organizational structure, an entity that is organized for charitable purposes. Because it is not organized for charitable purposes, a mutual benefit corporation's property may not be exempt from taxation.

Although not necessary to reach a conclusion, legislative history confirms the analysis. *See State v. Trenary*, 316 Or 172, 178 n 5, 850 P2d 356 (1993) ("Although we need not

resort to legislative history, it confirms our conclusion."). A mutual benefit corporation is one that is organized for the mutual support of its members. Tape Recording, House Committee on Judiciary, Civil Administration Subcommittee, HB 2278, Jan 18, 1989, Tape 5, Side B (statement of Ted Falk for Oregon State Bar). In other words, "[m]utual benefit corporations hold themselves out as benefitting, representing, and serving a group of individuals or entities." Testimony, House Committee on Judiciary, HB 2278, Feb 1, 1989, Ex N at 18 (Commentary on Revised Oregon Nonprofit Corporation Act). Further, a mutual benefit corporation is "not really doing something that is a charitable purpose so it wouldn't really qualify [for exemption] * * * but it is nonprofit if organized to provide services to members." Tape Recording, House Committee on Judiciary, Civil Administration Subcommittee, HB 2278, Jan 18, 1989, Tape 5, Side B (statement of Ted Falk for Oregon State Bar). *See also* Tape Recording, House Committee on Judiciary, HB 2278, March 3, 1989, Tape 14, Side A (statement of Rep Kelly Clark) (describing a mutual benefit corporation as one "where you and I are in it for our mutual benefit").

### III. CONCLUSION

Plaintiff amended its Articles of Incorporation to become a mutual benefit corporation. By doing so, it accepted the benefits[2] and burdens of being a mutual benefit corporation. It is bound by its decision and may not now disavow its choice. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is denied.

---

[2] One of the benefits is that mutual benefit corporations appear to be less subject to oversight of the Attorney General. Testimony, House Committee on Judiciary, HB 2278, Feb 1, 1989, Ex N at 18 (Commentary on Revised Oregon Nonprofit Corporation Act).