IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

COLUMBIA EMPIRE REGION )
VOLLEYBALL ASSOCIATION, )
 )
  Plaintiff, ) TC-MD 150421N
 )
  v. )
 )
MULTNOMAH COUNTY ASSESSOR, )
 )
  Defendant. ) **FINAL DECISION**[1]

Plaintiff appeals Defendant's exemption denial for property identified as Account

P670448 (subject property) for the 2015-16 tax year. The subject property is 24 portable

volleyball courts. (Stip Facts at 3.) The parties filed Stipulated Facts, Motions for Summary

Judgment, Responses, and Replies. Oral argument was held by telephone on April 4, 2016.

Greg K. Hitchcock, Attorney at Law, appeared on behalf of Plaintiff. Jacqueline Kamins,

Assistant County Counsel, appeared on behalf of Defendant.

## I. STATEMENT OF FACTS

A. *Organization*

Plaintiff "is the designated governing body for USA Volleyball (USAV) in the

jurisdiction of Oregon and Southwest Washington. As a governing body, [Plaintiff] acts on

behalf of USAV in its jurisdiction. There are 40 total 'regions' within USAV." (Stip Facts at 1.)

"USAV is the governing body for the sport of volleyball in the United States." (*Id.* at 2.)

USAV's goals "are to achieve competitive success, grow the sport at all levels throughout the

U.S., support services to provide quality programs, and to maintain a structure that allows

_____

[1] This Final Decision incorporates without change the court's Decision, entered August 12, 2016. The court did not receive a statement of costs and disbursements within 14 days after its Decision was entered. *See* Tax Court Rule–Magistrate Division (TCR–MD) 16 C(1).

efficient programs." (*Id.*) Plaintiff's "stated mission is to promote, foster and teach life-long lessons through volleyball in Oregon and Southwest Washington." (*Id.*)

Drew Mahalic, the CEO of the Oregon Sports Authority, wrote that:

"Within many sports, and all Olympic sports, there is a national governing body that sets the rules for competition, creates policies and provides low-cost insurance for participation in that sport. * * * Most of these governing bodies derive their authority from the Amateur Sports Act of 1978 (as amended in 1998). These national governing bodies typically designate local organizations as their representative for a specific area."

(Aff of Mahalic at 2.) Plaintiff is one such organization. (*Id.*)

Plaintiff "is an Oregon public benefit nonprofit corporation under ORS Chapter 65" and is also "exempt from federal taxes under Internal Revenue Code Section 501(c)(3) * * *." (Stip Facts at 2-3.) Plaintiff's "Articles of Incorporation and Bylaws state that it is organized as a nonprofit corporation and that the assets will be used for charitable purposes when the organization dissolves." (*Id.* at 3.) Its Articles list six purposes, including "teach[ing] the sport of volleyball to children and adults * * * provid[ing] practice volleyball sessions, classroom lectures, seminars and panel discussions" and "foster[ing] and conduct[ing] * * * volleyball competitions." (Stip Ex 1-A at 4.) Plaintiff's Bylaws state its "primary purpose" is "to foster regional, national, and international amateur volleyball competition[.]" (Stip Ex 2-B at 1.)

Plaintiff "is a membership organization. Certain directors are elected for certain categories of members: specific board positions include junior girls, junior boys, officials, parents, adult and geographical." (Stip Facts at 3.) Plaintiff has 11 volunteer board members who spend about 25 to 50 hours per year on their duties each year and 15 volunteer committee members who spend 10 to 30 hours on their duties each year. (*Id.* at 22.)

/ / /

/ / /

B.      *Membership*

Membership in Plaintiff entitles an individual to participate in Plaintiff's activities, provides membership in USAV, and provides "health and accident insurance for participating in [Plaintiff's] events." (Stip Facts at 4; 7.) Plaintiff membership is open to anyone. (*Id.* at 4.) Plaintiff and "USAV have nondiscrimination provisions for membership * * *." (*Id.*) In order to become a member of Plaintiff, an individual must "make a team that participates in [Plaintiff's] events." (*Id.* at 6.) Plaintiff "has over 450 teams of varying skill levels so there are many opportunities for an individual to find a team that matches their skill levels." (*Id.*) "An individual seeking to become a member [of Plaintiff] pays $10 which entitles them to tryout with various volleyball club teams." (*Id.*) That fee provides insurance coverage for the individual's "limited participation in trying out for up to five teams." (*Id.*)

Once an individual makes a club team, they pay the remainder of Plaintiff's annual membership fee, which depends on the membership category. (*Id.*) Plaintiff has approximately 6,000 members, of which 4,762 are "Junior Girls" between the ages of 10 and 18 years old. (*Id.* at 5.) Plaintiff's annual membership fee for junior girls is $55. (*Id.*) Plaintiff's other membership categories are junior boys, children ages 8 and under, adults involved with a junior program, adult players, collegiate players, and "Summer/Outdoor" players. (*Id.*) Annual membership fees for those categories range from free (for 8 and under) to $50 (for adults involved with a junior program). (*Id.*) Plaintiff's membership rates for junior girls, junior boys, adult players, and adult coaches are less than rates of four surrounding regional organizations. (*Id.* at 6.) Membership rates for junior girls range from $60 to $72 per year in those four other organizations. (*Id.*)

/ / /

"Once a person is a member of [Plaintiff] and makes a club team, they then pay whatever fees the club requires to pay for coaching, tournament fees, court rentals, etc. Club fees can range from a few hundred dollars to several thousand dollars per year, and on average are $1,300 to $1,800." (Stip Facts at 10.) The club teams are independent entities; Plaintiff has no control over the club team fees. (*Id.*)

C.      *Plaintiff's Programs--Tournaments*

Plaintiff's "major program is the indoor volleyball season which runs from December through May." (Stip Facts at 10.) Plaintiff establishes and enforces rules for club teams to participate in its events, including background checks and safety training for coaches. (*Id.*) "[A]ll adults in positions of authority or influence at [Plaintiff's] events are given criminal background checks. Similarly, coaches and officials have to take instruction courses to ensure basic competence," including safe practices. (*Id.* at 7.)

Plaintiff's members may participate in tournaments hosted or facilitated by Plaintiff "at lower rates * * * because [Plaintiff] enables them to pool resources and defray costs." (*Id.*) Plaintiff "believes that its low cost model allows it to offer the benefits it provides at rates that are below market rate compared to other recreational programs."[2] (*Id.* at 9.)

> "Obtaining insurance for a sporting event is often difficult and expensive. Governing bodies, such as USAV, have negotiated and obtained insurance policies that provide affordable coverage for participating with a team and for competitions and other events. For the vast majority of those interested in hosting a sporting event, it is not financially possible to host a competition event or to conduct a program without insurance for the risks associated with such activities. Thus, affordable insurance is a key to allowing such events and programs to take place."

(Aff of Mahalic at 2-3.)

---

[2] At oral argument, Plaintiff clarified that its comparison here is to other USAV regional organizations and to commercial athletic clubs, not to schools, park districts, or church leagues.

Plaintiff's members pay $25 to $30 per person for two days of competition at the Regional Championship hosted by Plaintiff. (Stip Facts at 12.) The participation fees charged by Plaintiff are not sufficient to cover the costs of the Regional Championship; in 2015, entry fees totaled $110,400 (64.4 percent of total revenue) and expenses totaled $168,679. (*Id*.) The remainder of expenses was covered by $39,445 in grants and $21,486 in vendor income. (*Id.*) Plaintiff's staff time for that event cost $32,300 and was "paid from general organization funds." (*Id.*) Plaintiff "is also able to reduce entry fees because it owns half the courts needed for the event"--*i.e.*, the subject property. (*Id.* at 13.)

Individual members pay between $50 and $56.25 per person for four or five competition days in Plaintiff's "Power League" tournament series. (*Id.*) For the Regional Competition and Power League series, Plaintiff's members pay about $20 per competition day. (*Id.*) Plaintiff hosts a three-day tournament over President's Day weekend that costs individual members approximately $12.50 per day. (*Id.* at 13-14.) "Most other full-day recreational activities cost far more than $12.50 or $20 per day * * * ." (*Id.*); *see also* Aff of Goodwin at 14; Aff of Mahalic at 4.)

In addition to events hosted by Plaintiff, club teams apply to Plaintiff to sanction club team events--Plaintiff provides event insurance for sanctioned events. (Stip Facts at 14-15.) The "sanction fee" is $150 "and is applied to the payment of the official that is sent to work the event." (*Id.* at 15.) Club team-hosted tournaments in Eugene, Oregon; Seattle, Washington; and Corvallis, Oregon, each used the subject property, thereby keeping event costs down as compared to other similar regional tournaments. (*Id.* at 16.)

/ / /

/ / /

D.     *Plaintiff's Other Services and Benefits*

Plaintiff "provided $12,500 in 'scholarships' of up to $500 each to reduce the cost of participation for 28 members.  These amounts went toward their fees to participate on a team * * * These are needs-based scholarships." (Stip Facts at 19.)  Plaintiff made grants totaling $2,000 to teams that qualified for Junior Nationals and made another $2,000 in grants to teams that qualified for Adult Nationals.  (*Id.*)  Plaintiff "provided a total of $1,200 to help offset the travel costs for officials who elected to officiate USAV national championship events."  (*Id.* at 20.)

Plaintiff conducted coaching classes, including a free basic course whereas "[m]ost other USAV Regions charge between $25 and $75" for similar courses.  (*Id*. at 17.)  Plaintiff "subsidizes the payment of instructors ($200 per class for 8-10 classes per year) and any associated facility rental for the course to take place. * * * [T]he value of this free benefit provided to new coaches is approximately $15,000 per year."  (*Id.*)

In 2014, Plaintiff "provided 10 Sport Kits to Oregon and SW Washington middle schools" at a value of $150 per kit.  (*Id*.)  Plaintiff obtained the kits from USAV.  (*Id.*)  Plaintiff "worked with the Oregon Youth Authority to develop a volleyball program for its at-risk youth, at no cost to OYA."  (*Id.* at 18.)  "[I]n 2014, [Plaintiff] facilitated the donation of 24 volleyballs" to two Portland high schools."  (*Id.*)  Plaintiff "directs its Power League events to high school venues.  This allows the host high school teams to use [Plaintiff's] events as fundraisers, thereby allowing such programs to gain $800 to $2,000 per day in funding to use to support the high school volleyball and other school programs."  (*Id.* at 18-19.)

/ / /

/ / /

E.      *Plaintiff's Financials*

For the fiscal year ending June 30, 2015, Plaintiff's total revenue was $965,004, of which $359,485 was member fees and $398,245 was tournament entry fees. (Stip Facts at 20.) "Thus, for the services provided by [Plaintiff] to members, member fees paid for 78.5% of that cost and the remainder of the support came from other sources." (*Id.*) Plaintiff received "$70,370 in contributions and sponsorship," $31,713 in "special event income," and $36,150 in "in-kind contributions." (*Id.*) Plaintiff's expenses were $913,413, so Plaintiff's net revenue was $51,591. (*Id.* at 21.) Of Plaintiff's expenses, "over $600,000 (or about 65%) is pass-through or direct benefit to members or the general public. Items include fees paid to USAV, tournament expenses, clinics and scholarships." (*Id.*) Plaintiff's employee costs were $225,000 for three full time staff members, "and about 70-75% of employee time is spent in direct service to members * * *." (*Id.*)

F.      *Societal Benefits of Volleyball Programs; Other Volleyball Program Providers*

H.L. Jack Elder, founder and president of Oregon Sports Action, Inc., explained that "sports are an important part of society and provide many benefits." (Aff of Elder at 4; *see also* Aff of Mahalic at 2 (describing the health and economic benefits of sporting events).) Schools, governmental park districts, and "nonprofit organizations such as Catholic Youth Organization and YMCAs" also offer volleyball programs. (Stip Facts at 8.) "[S]chools and parks obtain facilities and make their facilities available to community sports organizations because these activities benefit our state." (Aff of Elder at 4.) Elder wrote that "[g]overnment cannot provide all the sports programs, or even most of them, and relies on nonprofit entities such as [Plaintiff] * * * to help meet this need. Based on [his] experience, there is no doubt that [Plaintiff] provides important benefits to the community and does so in a cost-effective manner." (*Id.*) Mahalic

stated that if organizations such as Plaintiff "did not exist to provide affordable sports opportunities, there would be greater demand from the public for such additional services from the governmental entities, such as public schools and parks and recreation districts." (Aff of Mahalic at 2.) He noted that "some private athletic clubs offer volleyball as part of their services and the costs to * * * participate in volleyball are substantially higher for private club members than for the community programs [Plaintiff] enables through its structure." (*Id.* at 4-5.)

## II. ANALYSIS

The ultimate issue in this case is whether the subject property is exempt from property taxation under ORS 307.130 for the 2015-16 tax year.[3] ORS 307.130(2) exempts from property taxation certain property owned by incorporated charitable institutions. Defendant determined that Plaintiff was not "charitable institution" within the meaning of ORS 307.130(2). In order to be a "charitable institution" under ORS 307.130(2), "(1) the organization must have charity as its primary, if not sole, object; (2) the organization must be performing in a manner that furthers its charitable object; and (3) the organization's performance must involve a gift and giving." *SW Oregon Pub. Def. Services v. Dept. of Rev.*, 312 Or 82, 89, 817 P2d 1292 (1991). There is no dispute that Plaintiff satisfies the second part of the *SW Oregon* test. (Def's Mot Summ J (Mot) at 6.)

"Exemption is an exception to the general rule that all property is taxable." *Evergreen Aviation & Space Museum v. Yamhill County Assessor*, TC 5181, 5182, WL 1559051 at *2 (2016), citing *Dove Lewis Mem. Emer. Vet. Clinic v. Dept. of Rev.*, 301 Or 423, 426-27, 723 P2d 320 (1986). "Oregon follows the rule that 'tax exemption statutes should be strictly construed in favor of the state and against the taxpayer.'" *North Harbour Corp. v. Dept. of Rev.*, 16 OTR 91,

---

[3] The court's references to the Oregon Revised Statutes (ORS) are to 2013.

94 (2002), quoting *Mult. School of Bible v. Mult. Co.*, 218 Or 19, 27, 343 P2d 893 (1959). "In cases where the question is not legislative intent but whether a property fits the statute, even in close cases, exemption will be denied." *Evergreen Aviation*, WL 1559051 at *2 (2016), citing *Washington Co. Assessor II v. Jehovah's Witnesses*, 18 OTR 409, 422 (2006).

Summary judgment is proper where, construing the facts in the light most favorable to the adverse party, "there is no genuine issue as to any material fact" such that "the moving party is entitled to prevail as a matter of law." Tax Court Rule 47 C. As the party seeking relief, Plaintiff bears the ultimate burden of proof and must establish its case by a preponderance of the evidence. ORS 305.427. A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971).

A.      *Charity as Primary Object*

The first part of the *SW Oregon* test requires that the organization "have charity as its primary, if not sole, object[.]" 312 Or at 89. Historically, "charity" had a narrower meaning under Oregon case law, but more recently the legislature has expanded the definition. *See YMCA v. Dept. of Rev.*, 308 Or 644, 652, 784 P2d 1086 (1989). "An institution shall not be deprived of an exemption under this section because its purpose or the use of its property is not limited to relieving pain, alleviating disease or removing constraints." ORS 307.130(4). "The activity conducted by the charitable institution must be for the direct good or benefit of the public or community at large. Public benefits must be the primary purpose rather than a by-product." OAR 150-307.130-(A)(4)(b). "[T]he institution must perform a function or act which is good or beneficial for humans and other living things." OAR 150-307.130-(A)(5)(c).

Defendant makes two arguments against Plaintiff's claim that it has a charitable purpose: First, Defendant argues that Plaintiff is organized primarily for the benefit of its members,

similar to the rifle club example in OAR 150-307.130-(A)(4)(b); and second, Defendant argues that "the purpose of improving the caliber and availability of volleyball tournaments is not 'charity.'" (Def's Mot at 3-4.) The court addresses each argument in turn.

1. *Whether Plaintiff is Organized Primarily for the Benefit Of Its Members*

Defendant compares Plaintiff to the rifle club example in the administrative rule:

> "An organization that is established primarily for the benefit of its members, is not a qualifying charity. For example, a rifle club formed primarily for the pleasure of its members also provides safety information and instruction. Since the club's primary purpose is not to provide a direct benefit to the public, its property is not exempt. An organization that performs a service to a professional organization of private persons (example: teachers, physicians or architects) is not a charity."

OAR 150-307.130-(A)(4)(b). Plaintiff responds that the rifle club example in the administrative rule describes a mutual benefit corporation, not a public benefit corporation. (Ptf's Resp at 1.) Plaintiff argues that it is not a member benefit organization; Plaintiff's founders are not the recipients of Plaintiff's benefits and services. (*See* Ptf's Mot Summ J (Mot) at 13-14.)

This court has previously explained the difference between a public benefit corporation and a mutual benefit corporation, concluding that a mutual benefit corporation may not qualify for a charitable property tax exemption under ORS 307.130:

> "It is clear from comparing the two definitions [of mutual and public] and looking at the plain, natural, and ordinary meanings of 'mutual' and 'public,' that a mutual benefit corporation is intended to benefit a select group while a public benefit corporation is intended to benefit the community as a whole. Thus, a mutual benefit corporation is not, by its very choice of organizational structure, an entity that is organized for charitable purposes. Because it is not organized for charitable purposes, a mutual benefit corporation's property may not be exempt from taxation."

*Rogue Gem v. Josephine County Assessor*, 17 OTR-MD 446, 454 (2003). The parties stipulated that Plaintiff "is an Oregon public benefit nonprofit corporation under ORS Chapter 65[.]" That is supported by Plaintiff's Articles. (Stip Ex 1-A at 4.) "The articles and bylaws of a corporation

are prima facie evidence of the character of the corporation." *Dove Lewis Mem. Emer. Vet. Clinic, Inc. v. Dept. of Rev.*, 301 Or 423, 427, 723 P2d 320 (1986).

Plaintiff's membership is open to any player who can make a club team, as well as to parents of players and officials. Thus, the individuals who may utilize Plaintiff's services are limited to those with some minimum ability to play volleyball and supporters. The parties stipulated that Plaintiff had approximately 6,000 members. No evidence was submitted as to how many individuals have been denied membership in Plaintiff, although the parties stipulated that there are "over 450 teams of varying skill levels so there are many opportunities for an individual to find a team that matches their skill levels." (Stip Facts at 6.) On those facts, the court finds that Plaintiff's membership more likely than not open to the public. Plaintiff's membership structure serves the purpose of collecting user fees to help pay for Plaintiff's services. As discussed more in the "gift or giving" analysis, "[t]he fact that an organization charges a fee for its services does not necessarily invalidate its claimed status as charitable." OAR 150-307.130-(A)(4)(d)(C). The court is persuaded that Plaintiff is a public benefit corporation and is not excluded from the definition of "charitable institution" due to its membership structure.

2.      *Whether Plaintiff's Purpose is Charitable*

As noted above, the articles and bylaws "are prima facie evidence of the character of the corporation." *Dove Lewis*, 301 Or at 427. Plaintiff's Bylaws state its "primary purpose" is "to foster regional, national, and international amateur volleyball competition[.]" (Stip Ex 2-B at 1.) Its Articles and Bylaws describe additional purposes, such as teaching the sport of volleyball and providing other practice and educational opportunities relating to volleyball. Plaintiff argues that facilitating youth sports and educating children is a public benefit, as evidenced by the fact "that

government itself at several levels conducts and supports sports programs." (Ptf's Resp at 4; *see also* Ptf's Mot at 11-12.) Plaintiff noted that "[t]he Oregon Department of Revenue has held that providing recreational sports programs is a charitable activity." (Ptf's Resp at 5, citing *In the Matter of the Appeal of Oregon Sports Academy, Inc.*, Opinion and Order No 93-4420 (Aug 8, 1994).)

The court is persuaded that providing athletic opportunities to children and adults is a beneficial activity that may constitute charity. Courts in Oregon and other states have implicitly or explicitly reached that conclusion. (*See* Ptf's Resp at 4-5 (discussing cases).) As Plaintiff noted, state and federal governments provide and promote athletic opportunities, demonstrating that such opportunities are a public benefit. (*See* Ptf's Mot at 15 (discussing the Amateur Sports Act of 1978.) The court must consider whether Plaintiff's activities involve sufficient gift or giving to conclude that Plaintiff is a "charitable institution." *See Dove Lewis*, 301 Or at 427 (declining to conclude that the taxpayer's beneficial purpose was charitable "as a matter of law," and proceeding to consider whether its conduct involved "the element of gift or giving.").

B.      *Gift or Giving*

The third part of the *SW Oregon* test requires that "the organization's performance must involve a gift or giving." 312 Or at 89. "In determining whether an organization is, by its conduct, charitable, the crucial consideration is the element of a gift or giving." *SW Oregon*, 312 Or at 89, quoting *Dove Lewis*, 301 Or at 428. Whether an organization's performance involves gift or giving is considered from the perspective of "the recipient of the charitable giving." *SW Oregon*, 301 Or at 91. The question is "not whether [the organization] gains some kind of remuneration from some source, but whether, *so far as the recipient is concerned,* the [organization's] services are given to the recipients with strings attached." *Id.* at 91-92

(emphasis in original); *see also Serenity Lane, Inc. v. Lane County Assessor*, 21 OTR 229, 242-43 (2013) ("[t]he question is whether individuals other than those who own or operate the institution receive a benefit without any expectation of reciprocity from the recipient.").)

> "When determining whether the operations of a given institution involve 'gift or giving,' Oregon courts turn to another multi-factor test. * * * [N]ot all of the factors looked at in this test need to be present for a court to determine that the 'gift or giving' requirement has been met. * * * [T]he list of factors is not exhaustive; a court can find that sufficient 'gift or giving' exists for reasons other than those specifically listed in this test."

*Serenity Lane,* 21 OTR at 236, citing *Methodist Homes, Inc. v. Tax Com.*, 226 Or 298, 310, 360 P2d 293 (1961). "These factors are:

> '(1) Whether the receipts are applied to the upkeep, maintenance and equipment of the institution or are otherwise employed;
>
> '(2) Whether patients or patrons receive the same treatment irrespective of their ability to pay;
>
> '(3) Whether the doors are open to rich and poor alike and without discrimination as to race, color or creed; and
>
> '(4) Whether charges are made to all and, if made, are lesser charges made to the poor or are any charges made to the indigent.' "

*Id.*, citing *SW Oregon* and OAR 150-307.130-(A)(4)(d)(C).

1.      *Use of Plaintiff's Receipts*

> "The first 'gift or giving' factor deals with the revenues of a purportedly charitable institution at the level of the institution * * *. The point of the factor is that revenues received by an institution organized for a charitable purpose must be used in furtherance of the charitable purpose of the institution rather than, for instance, the enrichment of the private individuals that control the institution."

*Hazelden Foundation v. Yamhill County Assessor*, 21 OTR 245, 252 (2013).

Plaintiff asserts that its "fees are used for the upkeep of the organization." (Ptf's Mot at 16.) For Plaintiff, "providing services to participants is the 'upkeep of the organization' along with taking care of the [subject property] and other equipment." (*Id.* at 19.) The majority of

Plaintiff's revenue in the fiscal year ending June 30, 2015, was used to pay for member benefits, including USAV fees, tournament expenses, clinics, and scholarships. The second largest expense item was employee costs. 70 to 75 percent of employee time was spent in direct service to members. On those facts, the court is persuaded that Plaintiff's receipts were applied to its upkeep, maintenance, and equipment. This factor supports Plaintiff.

2. *Treatment of Patrons Based on Ability to Pay*

There is no evidence in this case that any individuals accessed Plaintiff's primary service (membership) without paying for it. As a result, the court is unable to determine if patrons received the same treatment regardless of their ability to pay.

3. *Whether the Doors are Open to Rich and Poor Alike and Without Discrimination*

Plaintiff asserts that it "does not discriminate based on race, color or creed or any other factor," and Defendant did not challenge that assertion. (Ptf's Mot at 16.) The question is whether Plaintiff's doors are open to rich and poor alike. "[F]ailure by taxpayer to show that its doors are indeed 'open to rich and poor alike' would severely undermine the case for the presence of 'gift or giving.'" *Hazelden*, 21 OTR at 253. In the context of an addiction treatment program, this court explained that "a high price tag alone can amount to a *de facto* ban on patients who lack either sufficient personal assets or sufficient insurance to pay for the treatment if those prices are insisted upon in all cases and if those who cannot afford to pay are denied treatment for no other reason than their inability to pay." *Id.* at 254.

Plaintiff argues that "its fees are so low that its programs are available to every income class, even those in the lowest income categories * * *." (Ptf's Reply at 5-6.) Defendant responds that poor or indigent people are substantially excluded from participation in Plaintiff's activities because the total cost of that participation--membership fees, team fees, travel fees--is

considerable. (Def's Reply at 7.) Although Plaintiff's membership fees are not more than $55 per year, the total annual cost to an individual to participate in club volleyball ranges from $1,300 to $1,800. Plaintiff responds that it "identified that the public need is assistance in paying for the cost of joining a team, the costs of which are outside of Plaintiff's control." (Ptf's Reply at 6.)

The court understands that Plaintiff lacks control over the fees established by various teams.[4] However, the court agrees with Defendant that, from the perspective of an individual considering membership in Plaintiff, the total cost to participate in volleyball is relevant. The majority of Plaintiff's members are young people participating in volleyball. There is no reason that those individuals would join Plaintiff and pay its membership fee unless they intended to join a volleyball team. Indeed, Plaintiff's fee structure requires an initial payment of $10 to try out for up to five volleyball teams. The full membership fee is not due unless that person makes a team. The fee is not refunded if the person fails to make a team. Even though the volleyball teams are separate entities from Plaintiff, they work together with Plaintiff to provide a service. As a result, it is difficult to view Plaintiff as truly distinct from the teams.

Plaintiff recognizes the cost associated with team participation and provided need-based scholarships totaling $12,500 in 2014-15. (*See* Ptf's Mot at 19-20.) The scholarships were up to $500 each and were provided to 28 of Plaintiff's members. Defendant noted that Plaintiff's giving amounted to 1.3 percent of its revenue, and less than one half of one percent of Plaintiff's members received a scholarship in 2014-15. (Def's Mot at 8-9.)

In *Hazelden*, the court considered whether the taxpayer's "patient aid program" supported the taxpayer's assertion that it's "doors were truly open to rich and poor alike." 21 OTR at 254.

---

[4] The parties stipulated that team fees include tournament fees. Plaintiff establishes the fees for its tournaments, so that component of team fees is partially within Plaintiff's control.

The court reviewed the details of the program, observing:

> "the distribution of taxpayer's grants of patient aid among the varying tiers on taxpayer's patient aid scale * * * suggests a marked tendency on the part of taxpayer to grant relatively modest discounts off the nominal price of treatment to larger numbers of patients, rather than granting larger discounts to less affluent patients or reducing the list prices for its services."

*Id.* at 256. Plaintiff's need-based scholarship program is undoubtedly evidence of some gift or giving by Plaintiff, although it would have been helpful to receive more information about how Plaintiff determined a member's financial need and the amount of the scholarship awarded. *See Serenity Lane*, 21 OTR at 239-40 ("in the absence of evidence tending to show Serenity's guidelines for distributing their scholarship money, the court cannot say any more than that the evidence in the record relating to the fourth gift or giving factor weighs marginally in favor of finding the presence of gift or giving."). The fact that Plaintiff's maximum scholarship amount was $500 indicates that, as in *Hazelden*, Plaintiff prioritized providing a modest discount off the total cost to participate in team volleyball, rather than providing more financial assistance to the poor.[5] A $500 scholarship would cover between 28 and 38 percent of the typical annual fees associated with participating in team volleyball, leaving an individual with remaining team fees between $800 and $1,300, in addition to Plaintiff's membership fee.

The obligation to provide scholarships or fee waivers for participation in volleyball cannot fall solely on Plaintiff given that the teams are separate entities that also impose fees on participants. However, from the perspective of most volleyball participants, Plaintiff's services only make sense when viewed in combination with the teams. Plaintiff's scholarship program, while commendable, is not sufficient for the court to conclude that Plaintiff's doors are truly open to rich and poor alike. An individual seeking to participate in team volleyball must pay

---

[5] Similarly, Plaintiff allocated several thousand dollars to help teams and officials offset the cost of traveling to national volleyball competitions. No evidence was presented to indicate those were need-based grants.

between $800 and $1,300 even after receiving a scholarship. It is unclear how a poor or indigent person would pay those fees. This factor weighs against Plaintiff

4.    *Charges to Patrons; Sliding Scale; Fee Waiver*

The fourth factor asks "[w]hether charges are made to all and, if made, are lesser charges made to the poor or are any charges made to the indigent." *Serenity Lane*, 21 OTR at 236. In *Serenity Lane*, the court found that "the existence of a need-based sliding scale of fees for treatment weighs, at the margins, in favor of a finding of the presence of 'gift or giving,'* * *." *Id*. at 239. By contrast, in *Dove Lewis*, the court found that the taxpayer did not mention free or discounted services unless an individual stated they could not afford payment. 301 Or at 431. "Moreover, taxpayer could not offer any specific examples or documentation that it actually provided free services to indigent pet owners. It appears that, in accordance with taxpayer's business procedures, the rendering of free or discounted services occurs only by happenstance, if at all." *Id.* at 431.

Plaintiff acknowledges that it "has never created a fee-waiver program for low income participants." (Ptf's Mot at 20.) As discussed above, Plaintiff has instead directed part of its funds to need-based scholarships to offset the cost of team participation. (*See id.*) Defendant responds that Plaintiff's failure to use "a sliding scale or other mechanism to make its services available to the poor * * * is likely fatal to [Plaintiff']s claim that it conducts sufficient gift or giving." (Def's Resp at 4.) Plaintiff replies that if it "had a demand from the public to provide waivers of its low fees, it would have developed such a program." (Ptf's Reply at 6.) Plaintiff charges individuals for the majority of its services and does not make lesser charges to the poor or waive charges for the indigent. Plaintiff's lack of a sliding fee scale or a fee waiver mechanism results in the fourth factor weighing against Plaintiff.

5.      *Provision of Services at Below Market Rates*

"[T]he 'gift or giving' requirement may be met by providing products or services to those in need at below-market rates." *Serenity Lane*, 21 OTR at 240; *see also* OAR 150-307.130-(A)(4)(d) ("[o]ften, a charitable organization's product or service is delivered to recipients at no cost or at a price below the market price or price to the organization of the product or service").

Plaintiff argues that its performance involves gift and giving because it "provid[es] its services in a non-commercial manner at rates far below market rates[.]" (Ptf's Mot at 10.) Plaintiff asserts that its programs are low-cost compared to "commercially available programs" and "other comparable nonprofit volleyball programs[.]" (*Id.* at 16.) Plaintiff additionally notes that its "services are provided at about a 25% discount from Plaintiff's actual cost * * *." (*Id.*)

The first aspect of Plaintiff's argument is that it provides low cost services to all participants, as compared with "commercial" programs.[6] During oral argument, Plaintiff acknowledged the difficulty of identifying commercial volleyball programs that compete with Plaintiff. Some private athletic clubs offer volleyball programs, but the court did not receive evidence on the cost to participate in such programs. *Cf. Serenity Lane*, 21 OTR at 240 (the taxpayer provided testimony from an economist to establish that it provided services at below market rates). Plaintiff compared its membership fees to those charged by several other USAV regional organizations; those fees were slightly higher than Plaintiff's, ranging from $60 to $72. However, the court is not persuaded that other USAV regional organizations compete in the same market as Plaintiff. The regions are divided up geographically so it is unlikely that a participant living in Portland would consider joining a volleyball organization in Seattle or

---

[6] Other alternatives to Plaintiff include volleyball programs provided by schools, park districts, and churches. Plaintiff admits that it charges more for its services as compared with those programs. Moreover, Plaintiff does not consider those programs comparable to Plaintiff's program given that Plaintiff provides a framework for more significant competition and skill development.

Northern California rather than in Portland. The court finds Plaintiff has failed to demonstrate by a preponderance of the evidence that it provides services for below market rates.

The second aspect of Plaintiff's argument is that it provides services for less than its own cost. The parties stipulated that member fees paid for 78.5 percent of the cost of member services. Plaintiff made up the difference with revenue from contributions, sponsorships, special event income, and in-kind contributions. This aspect of Plaintiff's activities weighs in favor of Plaintiff's claim that its performance involves gift or giving.

6.      *Relief of a Government Burden*

"If the activity of the charitable institution relieves a government burden, it is an indicator that the institution may be charitable." OAR 150-307.130-(A)(4)(c).

> " '[O]ne reasonable explanation for the government's decision to exempt charitable enterprises from the payment of taxes is that 'if such enterprises did not exist the government would be required to use tax dollars to do the job the charitable enterprises are now doing.'' * * * [T]herefore, government must not only have the obligation to do what the taxpayer is doing, but the taxpayer also must relieve the government of some or all of the *financial* burden of performing the charitable service."

*SW Oregon*, 301 Or at 89-90, quoting *Dove Lewis*, 301 Or at 431. (Emphasis in original.)

Plaintiff argues that its "programs complement governmental volleyball programs conducted by public schools and parks and recreation districts." (Ptf's Mot at 14.) "[I]f Plaintiff did not provide its programs, there would be more pressure on various governmental entities to provide such recreational opportunities." (*Id.* at 14-15.) Plaintiff argues that it " 'relieves' pressure on the government to provide such services." (Ptf's Reply at 5.)

The government provides volleyball and other athletic opportunities through schools and park districts. Plaintiff views its services as a complement to those governmental programs, rather than a substitute for them. For instance, Plaintiff's tournament season is designed to

follow the high school season.  There is no evidence that schools or park districts would be required to provide longer sport seasons if Plaintiff did not exist.  Given that Plaintiff has approximately 6,000 members, it is evident that there is a demand for Plaintiff's services.  However, filling a "public demand" is not the same as relieving a government burden.  *YMCA*, 308 Or at 656-57.  The court is not persuaded that Plaintiff relieves a government burden.

7.      *Reliance on Volunteers*

"The fact that individuals provide volunteer labor to assist the organization in performing its activities may indicate that the organization is charitable.  However, it is not a standard in determining whether an organization is charitable per se."  OAR 150-307.130-(A)(4)(d)(D).  Plaintiff argues that its "volunteer labor is significant * * *."  (Ptf's Mot at 16.)  The parties stipulated that Plaintiff has 11 volunteer board members and 15 volunteer committee members.  The court agrees with Plaintiff that the willingness of individuals to provide volunteer labor to assist with Plaintiff's activities is a factor that weighs in favor of Plaintiff.

8.      *Gift or Giving Conclusion*

Upon considering the gift or giving factors relevant in this case, the court finds the most significant to be whether Plaintiff's doors are open to rich and poor alike.  Plaintiff charges a fee for its services, yet makes no provision for fee waivers or reduced fees based on ability to pay.  Plaintiff operates in coordination with teams to provide competitive volleyball opportunities for typical annual fees ranging from $1,300 to $1,800 per person.  Plaintiff generously provides scholarships to help some individuals offset up to $500 of that cost, but the remaining cost to a poor or indigent individual is significant.  Plaintiff provides a beneficial and cost-effective service to its members, but the court is not persuaded that Plaintiff's performance involves sufficient gift or giving to qualify as a charitable institution.

### III.  CONCLUSION

After careful consideration, the court finds that Plaintiff's performance does not involve sufficient gift or giving to qualify as a charitable institution under ORS 307.130(2).  Plaintiff's appeal must be denied.  Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiff's Motion for Summary Judgment is denied; and

IT IS FURTHER DECIDED that Defendant's Motion for Summary Judgment is granted.

Dated this ____ day of August 2016.

_____
ALLISON R. BOOMER
MAGISTRATE

*If you want to appeal this Final Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within <u>60</u> days after the date of the Final Decision or this Final Decision cannot be changed.  TCR-MD 19 B.*

*This document was filed and entered on August 30, 2016.*